## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **TAMMIE STEVENS BOZEMAN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:18-cv-01809-MHH** |
| | } | |
| **ANDREW SAUL,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,**[1] | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 405(g), plaintiff Tammie Stevens Bozeman seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Bozeman's claim for disability insurance benefits. For the reasons stated below, the Court affirms the Commissioner's decision because substantial evidence supports the decision.

---

[1] The Court asks the Clerk to please substitute Andrew Saul for Nancy A. Berryhill as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 25(d) (When a public officer ceases holding office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

# I. PROCEDURAL HISTORY

Ms. Bozeman applied for disability insurance benefits. (Doc. 4-4, p. 14). She alleges that her disability began on May 1, 2014. (Doc. 4-4, p. 14). The Commissioner initially denied Ms. Bozeman's claim. (Doc. 4-4, p. 14). Ms. Bozeman requested a hearing before an Administrative Law Judge (ALJ). (Doc. 4-5, p. 9). The ALJ issued an unfavorable decision. (Doc. 4-3, pp. 11-17). The Appeals Council declined Ms. Bozeman's request for review, making the Commissioner's decision final for this Court's judicial review. (Doc. 4-3, p. 2). *See* 42 U.S.C. § 405(g).

# II. STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide

the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If a district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ did not provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.  SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

The ALJ determined that Ms. Bozeman met the Social Security Act's insured status requirements through March 31, 2018, and that Ms. Bozeman had not engaged in substantial gainful activity since the alleged onset date of May 1, 2014. (Doc. 4-3, pp. 11, 13). The ALJ determined that Ms. Bozeman suffered from the following severe impairments: obesity, status post breast cancer, thoracic and lumbar scoliosis, and lumbar degenerative disc disease. (Doc. 4-3, p. 13). The ALJ determined that Ms. Bozeman suffered from the non-severe impairments of hypertension and gastroesophageal reflux disease. (Doc. 4-3, p. 13). Based on a review of the medical evidence, the ALJ concluded that Ms. Bozeman did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 4-3, p. 14).

Given her impairments, the ALJ evaluated Ms. Bozeman's residual functional capacity. The ALJ determined that Ms. Bozeman could perform light work as defined in 20 C.F.R. § 404.1567(b) except she could frequently reach overhead with her left non-dominant hand; climb ramps and stairs; balance and stoop; and occasionally crouch, kneel, and crawl. (Doc. 4-3, p. 14). The ALJ found that Ms. Bozeman should avoid ladders, scaffolds, and exposure to unprotected heights. (Doc. 4-3, p. 14).

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). "To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

Based on this RFC, the ALJ concluded that Ms. Bozeman could perform her past relevant work as a packager or waitress. (Doc. 4-3, p. 16). Accordingly, the ALJ determined that Ms. Bozeman was not under a disability within the meaning of the Social Security Act. (Doc. 4-3, p. 16).

## IV. ANALYSIS

Ms. Bozeman contends that she is entitled to relief from the ALJ's decision because the ALJ evaluated her pain testimony and ability to perform past relevant work improperly. (Doc. 7, pp. 1-2). With respect to her pain testimony, Ms. Bozeman argues that her past work should bolster her credibility. The Court begins its analysis of these issues with a review of the ALJ's pain assessment and then considers the ALJ's past relevant work finding.

A.    Pain Standard

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 918 (11th Cir. 2019). When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r, Soc. Sec. Admin.*, 746 Fed. Appx. 864, 868 (11th Cir. 2019) (citing *Wilson*). If the ALJ does not apply the three-part standard properly, then reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395

F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson,* 284 F.3d at 1225; *Coley*, 771 Fed. Appx. at 918. As a matter of law, the Secretary must accept a claimant's testimony if the ALJ inadequately or improperly discredits the testimony. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*); *see Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987) ("It is established in this circuit if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true.").

When credibility is at issue, the provisions of Social Security Regulation 16-3p apply. SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. An ALJ must explain the basis for findings relating to a claimant's description of symptoms:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough . . . simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10. In evaluating a claimant's reported symptoms, an ALJ must consider:

> (i) [the claimant's] daily activities; (ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms; (v) [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms; (vi) [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r, Soc. Sec. Admin.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

Here, the ALJ found that Ms. Bozeman's medical records and daily activities do not support Ms. Bozeman's testimony regarding her pain and limitations. (Doc. 4-3, p. 15). Accordingly, the Court examines Ms. Bozeman's testimony and then compares her testimony to the evidence in the record.

1. Ms. Bozeman's Testimony

During the April 2017 administrative hearing, Ms. Bozeman testified that she last worked a waitress at Ryan's and that her back pain prevented her from working. (Doc. 4-3, pp. 61, 65). Ms. Bozeman described her pain as "start[ing] out slow," transitioning to sharp, and radiating throughout her back. (Doc. 4-3, p. 72).

According to Ms. Bozeman, her back hurt whenever she did anything, and she had to lie down for 20 to 30 minutes to relieve the pain or she would become nauseated. (Doc. 4-3, pp. 65, 72). Ms. Bozeman stated that when she walked, her back and upper legs hurt. (Doc. 4-3, pp. 60, 73). Ms. Bozeman testified that pain caused her to stay home and to "not want to do anything." (Doc. 4-3, pp. 60, 73).

Ms. Bozeman testified that pain prevented her from managing most household chores. (Doc. 4-3, pp. 73-74). Ms. Bozeman stated that she would wait two or three weeks before vacuuming, and she cooked occasionally. (Doc. 4-3, pp. 74, 76). According to Ms. Bozeman, showering, bathing, washing her hair, and moving around made her pain increase. (Doc. 4-3, p. 72).

At the time of the administrative hearing, Ms. Bozeman was living with her husband and pets. (Doc. 4-3, pp. 58, 75). Ms. Bozeman testified that her pastimes included using a tablet, spending time with her pets and grandchildren, and visiting her husband's parents who lived 30 minutes from her house. (Doc. 4-3, p. 76). Ms. Bozeman stated that she could drive or ride as a passenger three times weekly, walk

her dog occasionally, shop, attend religious meetings weekly, and distribute religious information "door to door" periodically. (Doc. 4-3, pp. 59, 60, 73, 75). According to Ms. Bozeman, if a home had steps, she would ask another volunteer to distribute the information "[b]ecause steps bother [her]." (Doc. 4-3, p. 75). Ms. Bozeman stated that she could walk on "a flat surface." (Doc. 4-3, p. 75).

Ms. Bozeman testified that she received injections from a neurologist to manage her pain. (Doc. 4-3, pp. 65-67). Ms. Bozeman testified that the injections helped "a little" but that she still was in a lot of pain. (Doc. 4-3, p. 68). Ms. Bozeman stated that she visited the Crawford Clinic for treatment of arthritis. (Doc. 4-3, p. 68). According to Ms. Bozeman, she postponed the physical therapy that Crawford Clinic recommended because she wanted to see how she responded to the neurologist's injections. (Doc. 4-3, pp. 68-69).

Ms. Bozeman testified that she was taking blood pressure, acid reflux, muscle spasm, and anti-inflammatory medication. (Doc. 4-3, pp. 69-70, 71). Ms. Bozeman stated that sometimes her medication bothered her stomach. (Doc. 4-3, p. 70). Ms. Bozeman stated that she usually would lie down to "ease[] the pain, instead of taking medicine." (Doc. 4-3, p. 72).

## 2. Ms. Bozeman's Medical Records[2]

In early February 2014, three months before she alleges her disability began, Ms. Bozeman visited a certified registered nurse practitioner at Quality of Life Health Services, Inc. and complained of a sore throat. (Doc. 4-10, pp. 84, 88). Ms. Bozeman reported exercising two to three times weekly and experiencing no pain. (Doc. 4-10, pp. 85, 86). After examining Ms. Bozeman, the CRNP's musculoskeletal findings were "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain or inspection." (Doc. 4-10, p. 87). The record from Ms. Bozeman's second February 2014 visit to Quality of Life contains similar notes about Ms. Bozeman's musculoskeletal functioning. (Doc. 4-10, p. 89); (*see also* Doc. 4-10, pp. 90, 91) (exercising weekly and negative for back, joint, and neck pain, swelling, and muscle weakness).

---

[2] The Court has reviewed but not summarized treatment records that predate 2014—the year of Ms. Bozeman's alleged onset—or records unrelated to Ms. Bozeman's severe impairments. (*See, e.g.*, (Doc. 4-10, pp. 3-83) (Quality of Life Health Services, Inc. visit records from April 2010 to December 2013); (Doc. 4-11, pp. 46-50) (Advanced Imaging of Gadsden mammogram, abdomen CT scan, and left leg ultrasound records); (Doc. 4-11, pp. 51-63) (Quality of Life metabolic panel reports); (Doc. 4-12, pp. 69-71) (February 2009 abdominal treatment records); (Doc. 4-12, pp. 72-78) (vein treatment records); (Doc. 4-13, pp. 4-7) (Gadsden Regional Medical Center – Women's Imaging Center mammogram and abdomen/pelvis CT scan records); (Doc. 4-13, pp. 8-16) (Gadsden Regional Medical Center epigastric pain treatment records); (Doc. 4-13, pp. 17-21) (Gadsden Regional Medical Center foot injury records); (Doc. 4-13, pp. 22-26) (Gadsden Regional Medical Center ChemoTx reaction treatment records); (Doc. 4-13, pp. 27-29) (Digestive Disease Specialists of NE Alabama treatment records)). Because Ms. Bozeman "is not claiming disability due to cancer," (Doc. 7, p. 6), the Court does not include a summary of Ms. Bozeman's breast cancer treatment records. (*See, e.g.*, Doc. 4-9, pp. 3-47; Doc. 4-12, pp. 20-64; Doc. 4-12, pp. 79-84).

During her third February 2014 visit to Quality of Life, Ms. Bozeman complained of cold symptoms and back pain. (Doc. 4-10, p. 94). Ms. Bozeman reported noticing within the past year that her right shoulder blade was higher than the left, causing a crooked back. (Doc. 4-10, p. 94). Ms. Bozeman expressed concern over her back but rated her pain as zero. (Doc. 4-10, pp. 94, 96). Ms. Bozeman exercised weekly. (Doc. 4-10, p. 95). After examining Ms. Bozeman, the CRNP detected scoliosis and a "moderately reduced" range of motion. (Doc. 4-10, pp. 96, 98). The CRNP recommended an x-ray of Ms. Bozeman's spine to determine the "degree of deformity." (Doc. 4-10, p. 97).

When she returned to Quality of Life in early March 2014, Ms. Bozeman complained of a sore throat. (Doc. 4-10, p. 99). Ms. Bozeman reported that she was moderately active and exercised weekly. (Doc. 4-9, p. 100). Ms. Bozeman rated her pain as zero. (Doc. 10-4, p. 101). After examining Ms. Bozeman, the CRNP's musculoskeletal findings were "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (Doc. 4-10, pp. 102, 103). Based on a body mass index of 30-39, the CRNP classified Ms. Bozeman as obese and recommended that she walk 20-30 minutes daily to lose weight. (Doc. 4-9, p. 102).

During a mid-March 2014 visit to Quality of Life, Ms. Bozeman complained of back pain. (Doc. 4-10, pp. 104, 106). Ms. Bozeman rated her pain at four and

reported that she exercised weekly. (Doc. 4-10, pp. 105-06). The CRNP detected scoliosis in Ms. Bozeman's thoracic and lumbar spine. (Doc. 4-10, pp. 106, 107). Based on Ms. Bozeman's x-ray results which showed scoliosis and some demineralization of her vertebra, the CRNP recommended that Ms. Bozeman have a bone density scan. (Doc. 4-10, p. 104 (reporting "dextroscoliosis t-spine[;] mild old wedge shape fractures of T6 7 8 9[;] also levoscoliosis of the LS spine with some demineralization of the vertebra"); *see also* Doc. 4-11, p. 44).

In March 2014, a CRNP at Quality of Life referred Ms. Bozeman to Dr. Spencer for a bone density study. (Doc. 4-9, p. 2; Doc. 4-10, p. 104). Dr. Spencer reported that Ms. Bozeman's hip had a "[n]ormal bone mineral density." (Doc. 4-9, p. 2). Dr. Spencer found that Ms. Bozeman had "osteopenia of the lumbar spine bordering on early osteoporosis." (Doc. 4-9, p. 2).

Ms. Bozeman visited Quality of Life in early June 2014 and complained of back pain and swelling ankles and feet. (Doc. 4-10, p. 108). Ms. Bozeman described her middle to lower back pain as fluctuating, persistent, aching, and dull. (Doc. 4-10, p. 108). Ms. Bozeman reported that bending, doing daily activities, extending, flexing, standing, and walking increased her pain. (Doc. 4-10, p. 108). Ms. Bozeman described her swelling as moderately severe and reported decreased mobility and tingling as symptoms. (Doc. 4-10, pp. 108, 110). According to the June 2014 record, Ms. Bozeman rated her pain as zero and reported being moderately

active and exercising weekly. (Doc. 4-10, pp. 109, 111). According to Ms. Bozeman's medication list, she was taking Lasix (one 20 mg tablet daily as needed) for swelling and tramadol (one 50 mg tablet every eight hours as needed). (Doc. 4-10, p. 112).[3]

Ms. Bozeman returned to Quality of Life twice in June 2014 and complained of cold symptoms. (Doc. 4-10, p. 113; Doc. 4-11, p. 2). During these visits, she reported exercising weekly and rated her pain at zero. (Doc. 4-10, pp. 114, 116; Doc. 4-11, pp. 3, 4). After examining Ms. Bozeman, the CRNP found that Ms. Bozeman's range of motion and muscle strength were normal and that her extremities were stable "with no pain on inspection." (Doc. 4-10, pp. 116-117; Doc. 4-11, pp. 5-6).

Ms. Bozeman complained of joint pain during her July 2014 visit to Quality of Life. (Doc. 4-11, pp. 7, 9). Ms. Bozeman reported exercising weekly, including walking. (Doc. 4-11, p. 8). Ms. Bozeman rated her pain at zero. (Doc. 4-11, p. 15). The CRNP examined Ms. Bozeman and detected pain in her ankles and feet. (Doc. 4-11, pp. 10). The CRNP encouraged Ms. Bozeman to walk for weight management and instructed her to take medication and stretch her heels and feet daily for pain.

---

[3] Tramadol "relieve[s] moderate to moderately severe pain. . . . [and] is similar to opioid (narcotic) analgesics." https://www.webmd.com/drugs/2/drug-4398-5239/tramadol-oral/tramadol-oral/details (last visited Feb. 12, 2020).

(Doc. 4-11, p. 10).  Ms. Bozeman's medication included tramadol for pain and Lasix for swelling.  (Doc. 4-11, p. 9).

When Ms. Bozeman visited Quality of Life in October 2014, she complained of back and left heel spur pain.  (Doc. 4-11, pp. 11, 13).  Ms. Bozeman reported that her persistent middle and lower back pain had been getting worse.  (Doc. 4-11, p. 11).  According to Ms. Bozeman, changing positions, performing daily activities, standing, and walking aggravated her pain; rest relieved it.  (Doc. 4-11, p. 11).  The October treatment record does not include a pain score.  (Doc. 4-11, p. 15).  Ms. Bozeman stated that she had an appointment scheduled with Gadsden Orthopedics.  (Doc. 4-11, p. 11).  The CRNP added diclofenac sodium (one 50 mg delayed-release tablet twice daily) for pain.  (Doc. 4-11, p. 16).[4]

Ms. Bozeman complained of back pain when she returned to Quality of Life in January 2015.  (Doc. 4-11, pp. 17, 19).  Ms. Bozeman described her persistent middle and lower back pain as aching, discomforting, and dull.  (Doc. 4-11, p. 17).  Ms. Bozeman stated that changing positions and doing daily activities aggravated her pain; medication relieved it.   (Doc. 4-11, p. 17).   Ms. Bozeman reported

---

[4] Diclofenac is a nonsteroidal anti-inflammatory drug "used to relieve pain, swelling (inflammation), and joint stiffness caused by arthritis. Reducing these symptoms helps [a person] do more of your normal daily activities."  https://www.webmd.com/drugs/2/drug-4284-4049/diclofenac-oral/diclofenac-sodium-enteric-coated-tablet-oral/details (last visited Feb. 12, 2020).

diagnoses of mild to moderate kyphoscoliosis and levoscoliosis. (Doc. 4-11, p. 17).[5] Ms. Bozeman rated her pain as zero. (Doc. 4-11, p. 19).

Ms. Bozeman's medication included Lasix (one 20 mg tablet daily) for swelling and meloxicam (one 7.5 mg tablet twice daily) for pain. (Doc. 4-11, p. 18). Ms. Bozeman stated that she had not been using Mobic (meloxicam) regularly "because she thought it was a 'pain medication.'" (Doc. 4-11, p. 17).[6] Ms. Bozeman reported that she was not taking Lasix. (Doc. 4-1, p. 18). After examining Ms. Bozeman's spine, the CRNP detected moderate neck and back pain with motion. (Doc. 4-11, pp. 22, 23). The CRNP instructed Ms. Bozeman to follow her medication regimen and "be as active" as possible, including "[s]tretching, cycling, [or] walking." (Doc. 4-11, p. 22).

During Ms. Bozeman's March 2015 visit to Quality of Life, she complained of abdominal and back pain. (Doc. 4-11, pp. 24, 27). Ms. Bozeman rated her pain as zero. (Doc. 4-11, pp. 24, 28). Ms. Bozeman reported being moderately active

---

[5] "Kyphoscoliosis is an abnormal curve of the spine on two planes: the coronal plane, or side to side, and the sagittal plane, or back to front. It's a combined spinal abnormality of two other conditions: kyphosis and scoliosis." https://www.healthline.com/health/kyphoscoliosis (last visited Feb. 13, 2020).

"Levoscoliosis is a kind of scoliosis where [a person's] spine twists and curves toward the left side of your body in a C shape." https://www.healthline.com/health/levoscoliosis (last visited Feb. 13, 2020).

[6] Mobic or meloxicam a nonsteroidal anti-inflammatory drug "used to treat arthritis. . . . [by] reduc[ing] pain, swelling, and stiffness of the joints." https://www.webmd.com/drugs/2/drug-18173/mobic-oral/details (last visited Feb. 12, 2020).

and exercising weekly, including walking.  (Doc. 4-11, p. 26).  Ms. Bozeman confirmed that she was taking Lasix and meloxicam as directed.  (Doc. 4-11, p. 27).  After examining Ms. Bozeman's neck, the CRNP reported normal findings.  (Doc. 4-11, pp. 30, 32).

When Ms. Bozeman returned to Quality of Life in May 2015, she complained of back and joint pain and rated the pain as three.  (Doc. 4-11, pp. 33, 36, 37).  The CRNP detected tenderness in Ms. Bozeman's spine and shoulders.  (Doc. 4-11, pp. 39, 40).  The CRNP increased Ms. Bozeman's meloxicam dose from 7.5 mg to 15 mg.  *Compare* (Doc. 4-11, p. 35), *with* (Doc. 4-11, p. 36; Doc. 4-11, p. 40).  The CRNP instructed Ms. Bozeman to follow her medication plan.  (Doc. 4-11, p. 40).

In July 2015, Ms. Bozeman saw Dr. Robertson, an internist, for a consultative examination.  (Doc. 4-11, pp. 65, 69).  During this visit, Ms. Bozeman reported that her back pain started in 2005 and rated the pain as four when resting.  (Doc. 4-11, p. 65).  Ms. Bozeman described the pain as achy and "located between the scapula at the upper thoracic spine except when . . . bend[ing] forward at the lumbar."  (Doc. 4-11, p. 65).  Ms. Bozeman stated that she was not active at home or in the yard and that she had to sit down after standing 20 to 30 minutes because of pain.  (Doc. 4-11, p. 65).  Ms. Bozeman denied attending physical therapy or receiving injections to manage her pain.  (Doc. 4-11, p. 65).

After examining Ms. Bozeman, Dr. Robertson noted that she walked without assistance and had a normal gait.  (Doc. 4-11, pp. 66, 67).  Dr. Robertson reported no difficulties for Ms. Bozeman getting or and off the examination table.  (Doc. 4-11, p. 66).  Dr. Robertson detected no problems with Ms. Bozeman's neck or extremities.  (Doc. 4-11, p. 67).  Dr. Robertson observed Ms. Bozeman walking toe to heel, squatting, and rising.  (Doc. 4-11, p. 67).  Dr. Robertson provided several range of motion findings for Ms. Bozeman but did not characterize them as normal or abnormal.  (Doc. 4-11, pp. 67-68).  The results of Ms. Bozeman's straight leg raising test were negative.  (Doc. 4-11, p. 68).[7]  Dr. Robertson reported that Ms. Bozeman had full motor strength with normal muscle bulk and tone.  (Doc. 4-11, p. 68).

Dr. Robertson completed a physical assessment of Ms. Bozeman and concluded that she had no standing, walking, sitting, or fine/gross manipulating limitations.  (Doc. 11, p. 69).  Dr. Robertson restricted Ms. Bozeman's maximum lifting to 50 pounds and stooping to frequently due to forward flexion difficulty.  (Doc. 4-11, p. 69).  Dr. Robertson restricted Ms. Bozeman from unprotected heights.  (Doc. 4-11, p. 69).

---

[7] Examiners use the straight leg raise test to evaluate patients "with low back pain and nerve pain that radiates down the leg."   https://www.ebmconsult.com/articles/straight-leg-raising-test (last visited Feb. 12, 2020).

Ms. Bozeman visited Quality of Life in July 2015 and complained of fatigue, generalized weakness, malaise, and myalgia. (Doc. 4-14, p. 2).[8] Ms. Bozeman stated that her symptoms had started earlier in July and gradually progressed. (Doc. 4-14, p. 2). According to Ms. Bozeman, "exertion, pain, and work issues" aggravated her symptoms. (Doc. 4-14, p. 2). Ms. Bozeman rated her pain as zero. (Doc. 4-14, p. 6). The CRNP examined Ms. Bozeman's extremities and reported normal findings. (Doc. 4-14, pp. 7, 8). Ms. Bozeman returned to Quality of Life in late July 2015 for lab testing. (Doc. 4-14, p. 9).

In August 2015, Ms. Bozeman received her Quality of Life July lab results which were "generally within normal limits." (Doc. 4-14, p. 11). During this visit, Ms. Bozeman denied back, joint, and neck pain, joint swelling, and muscle weakness. (Doc. 4-14, p. 14). Ms. Bozeman rated her pain as four. (Doc. 4-14, p. 15). The CRNP's examination of Ms. Bozeman revealed no neck or extremity abnormalities. (Doc. 4-14, pp. 15, 17). The CRNP did not address back pain in the plan section of the treatment record. (Doc. 4-14, p. 16). For depression, the CRNP

---

[8] Malaise is "[a] vague feeling of discomfort . . . that cannot be pinned down but is often sensed as 'just not right.'" https://www.medicinenet.com/script/main/art.asp?articlekey=4253 (last visited Feb. 13, 2020).

"Myalgia describes muscle aches and pain, which can involve ligaments, tendons and fascia, the soft tissues that connect muscles, bones and organs. Injuries, trauma, overuse, tension, certain drugs and illnesses can all bring about myalgia." https://www.hopkinsmedicine.org/health/conditions-and-diseases/myalgia (last visited Feb. 13, 2020).

recommended that Ms. Bozeman walk 15 minutes daily to "relieve stress and tension" and work toward increasing walking time to 30 to 45 minutes daily. (Doc. 4-14, p. 16).

In September 2015, Ms. Bozeman visited Dr. Buck, a general practitioner, as a walk-in patient and complained of back pain, headaches, and dizziness when bending. (Doc. 4-11, p. 70). Dr. Buck refilled Ms. Bozeman's meloxicam prescription. (Doc. 4-11, p. 72). Dr. Buck planned to refer Ms. Bozeman to an orthopedist. (Doc. 4-11, p. 71).

When visiting Quality of Life in October 2015, Ms. Bozeman complained that her back pain was worse. (Doc. 4-14, pp. 18, 21). Ms. Bozeman stated that "bending, changing positions, exten[ding], flex[ing], standing, twisting[,] and walking" aggravated her pain and that nothing relieved it. (Doc. 4-14, p. 18). The CRNP detected "[p]osterior tenderness" and reported normal rotation of Ms. Bozeman's back. (Doc. 4-14, pp. 22, 24). The CRNP instructed Ms. Bozeman to follow her medication plan to manage back pain. (Doc. 4-14, p. 23).

Based on Dr. Buck's referral, Ms. Bozeman visited Northeast Orthopedic Clinic, P.C. in October 2015. (Doc. 4-12, p. 2). Ms. Bozeman told the orthopedist, Dr. Ryan, that her back pain was mild when resting but that it was "much worse" when moving, walking, showering, lifting, and bending. (Doc. 4-12, p. 2). Ms. Bozeman described her pain as "gradually getting worse" with "more pain in the

upper back" but some low back pain with radiating leg pain when walking. (Doc. 4-12, p. 2). Ms. Bozeman did not know the source of her pain but stated that scoliosis could be related. (Doc. 4-12, p. 2). Ms. Bozeman also complained of neck stiffness, calf cramps, muscle weakness, numbness, and tingling. (Doc. 4-12, p. 3).

After examining Ms. Bozeman, Dr. Ryan noted she had normal coordination. (Doc. 4-12, p. 3). Dr. Ryan ordered x-rays of Ms. Bozeman's back and recommended a physical therapy plan. (Doc. 4-12, p. 3). Dr. Ryan summarized his impressions from the visit:

> Ms. Bozeman has some mild neck pain with no radiations into the arms, mild low back pain with no radiations in the legs. She has a normal motor, sensory, and reflex exam of the upper extremities, [and] normal motor, sensory, and reflex exam of the lower extremities. . . . Any time she is upright she has pain in the mid thoracic region. Standing or working in the kitchen or anything upright makes it worse. She says it does feel a little better when she lies down at the end of the day flat on her back and tries to straighten out. Plain films show significant development thoracic kyphosis with no scoliosis that's clinically evident on physical exam. She has a hyperlordosis of her cervical spine that's compensatory and a normal lumbar spine series with the exception of some mild flattening of lordosis. She has no radicular discomfort. This is all mechanical back pain[.] I believe it's muscular secondary to her significant developmental kyphosis. She's already on [m]eloxicam. I am putting her in physical therapy for local modalities and core strengthening. I will see her back as needed.

(Doc. 4-12, p. 3).[9]

---

[9] "Kyphosis is a spinal disorder in which an excessive outward curve of the spine results in an abnormal rounding of the upper back." https://orthoinfo.aaos.org/en/diseases--conditions/kyphosis-roundback-of-the-spine (last visited Feb. 13, 2020).

Ms. Bozeman returned to Quality of Life in January 2016 and complained of back pain with symptoms similar to her October 2015 visit. *Compare* (Doc. 4-14, p. 18), *with* (Doc. 4-14, p. 25). Ms. Bozeman stated that she had seen Dr. Ryan at Northeast Orthopedics, that he had recommended physical therapy, but that she could not afford the copayment. (Doc. 4-14, p. 25). Ms. Bozeman rated her pain at three. (Doc. 4-14, p. 27). The CRNP detected severe pain with range of motion of Ms. Bozeman's thoracic spine. (Doc. 4-14, pp. 27, 29). The CRNP reported normal neck findings. (Doc. 4-14, p. 27).

Based on a referral from Quality of Life, Ms. Bozeman visited RehabPartners, P.C. in early February 2016. (Doc. 4-12, p. 14). Ms. Bozeman rated her worst pain as nine, her best pain as three, and her current pain as five. (Doc. 4-12, p. 14). Ms. Bozeman reported that her back pain became severe in December 2015 and that she could no longer "do all of her housework especially anything requiring bending or rotation." (Doc. 4-12, p. 14). A physical therapist examined Ms. Bozeman and found that Ms. Bozeman had limited range of motion in her thoracic spine and strength in her upper extremities. (Doc. 4-12, pp. 14, 15). The therapist noted that Ms. Bozeman had "poor posture and rounded shoulders with pain limiting" her activities of daily living. (Doc. 4-12, p. 14). According to the therapist, Ms. Bozeman's rehabilitation potential was "[g]ood." (Doc. 4-12, p. 14). The therapist recommended a home exercise program. (Doc. 4-12, p. 14). Ms. Bozeman had a

physical therapy evaluation. (Doc. 4-12, p. 16). Ms. Bozeman returned to RehabPartners for physical therapy in mid-February 2016. (Doc. 4-12, p. 17).

During Ms. Bozeman's April 2016 Quality of Life visit, she complained of sinusitis. (Doc. 4-14, p. 30). Ms. Bozeman denied back, joint, and neck pain, joint swelling, and muscle weakness. (Doc. 4-14, p. 34). Ms. Bozeman rated her pain at zero. (Doc. 4-14, p. 34). The CRNP detected tenderness in Ms. Bozeman's spine and reported normal neck and extremity findings. (Doc. 4-14, pp. 35, 36).

Ms. Bozeman returned to Quality of Life in July 2016 and complained of fluctuating back pain. (Doc. 4-14, pp. 37, 41). Ms. Bozeman described the pain as aching and dull. (Doc. 4-14, p. 37). According to Ms. Bozeman, aggravating factors included bending, walking, and standing and medication provided relief. (Doc. 4-14, p. 37). Ms. Bozeman rated her pain as four. (Doc. 4-14, p. 41). After examining Ms. Bozeman, the CRNP detected mild range of motion pain in her thoracic spine and moderate pain in her lumbar spine. (Doc. 4-14, pp. 42, 43). The CRNP did not adjust Ms. Bozeman's medication plan. (Doc. 4-14, p. 42).

When Ms. Bozeman returned to Quality of Life in September 2016, she complained of sinusitis. (Doc. 4-14, p. 44). Ms. Bozeman reported no musculoskeletal problems and rated her pain as zero. (Doc. 4-14, pp. 49-50).

Ms. Bozeman visited Quality of Life in October 2016 and complained of fluctuating and persistent back pain. (Doc. 4-14, pp. 53, 57; Doc. 4-12, p. 18).

According to Ms. Bozeman, Dr. Ryan told her that her back condition was non-operable. (Doc. 4-14, p. 53). Ms. Bozeman stated that she wanted to obtain a second opinion before her November 2016 disability hearing. (Doc. 4-14, p. 53).

The CRNP recommended x-rays and provided Ms. Bozeman with a neurosurgeon referral for thoracic lumbar pain. (Doc. 4-12, pp. 18, 19; Doc. 4-14, p. 58). The CRNP did not adjust Ms. Bozeman's medication which included Lasix (20 mg) and meloxicam (15 mg). (Doc. 4-12, p. 18; Doc. 4-14, p. 59). After examining Ms. Bozeman, the CRNP detected mild scoliosis and mildly reduced range of motion in her thoracic and lumbar spine. (Doc. 4-14, pp. 58, 59).

In October 2016, Dr. Hager, a radiologist with Advanced Imaging, reported that Ms. Bozeman's thoracic spine showed "[m]inimal demineralization and mild kyphosis". (Doc. 4-12, p. 65). Dr. Hager's impressions were "mineralization kyphosis and minimal [degenerative joint disease]. . . . [with] [n]o additional focal or acute pathology." (Doc. 4-12, p. 65). Dr. Valentine, a radiologist at Gadsden Regional Medical Center, reported a normal MRI impression of Ms. Bozeman's thoracic spine in late October 2016. (Doc. 4-12, pp. 65-66).

Ms. Bozeman returned to Quality of Life at the end of October 2016. (Doc. 4-14, pp. 60, 64). Ms. Bozeman described pain that was deep, aching, dull, and throbbing. (Doc. 4-14, p. 60). Ms. Bozeman reported multiple aggravating factors including lifting, sitting, standing, and walking. (Doc. 4-14, p. 60). Ms. Bozeman

stated that she had hired an attorney to help with her disability claim. (Doc. 4-14, p. 60). Ms. Bozeman rated her pain as four. (Doc. 4-14, p. 64). After examining Ms. Bozeman, the CRNP detected tenderness and moderate range of motion pain in Ms. Bozeman's thoracic and lumbar spine. (Doc. 4-14, pp. 65, 66).

When Ms. Bozeman visited Quality of Life in January 2017, she complained of epigastric pain, a cough, back pain, and muscle weakness. (Doc. 4-14, pp. 67, 71). The CRNP noted kyphosis of Ms. Bozeman's thoracic spine and scoliosis of her lumbar spine but did not report range of motion issues. (Doc. 4-14, pp. 72, 73). The CRNP did not adjust Ms. Bozeman's Lasix or meloxicam prescriptions. (Doc. 4-14, p. 73).

In February 2017, Ms. Bozeman visited Dr. Gullung at Alabama Ortho Spine & Sports and complained of severe upper back pain radiating into her lower back and legs. (Doc. 4-15, pp. 2, 8). Ms. Bozeman rated her pain as nine and stated her symptoms had been present for one year. (Doc. 4-15, p. 2). Ms. Bozeman complained of "numbness, swelling, . . . difficulty walking[,] [n]ausea and occasional balance issues." (Doc. 4-15, pp. 2, 3). Ms. Bozeman described the pain as constant with a recent "insidious increase." (Doc. 4-15, p. 2). According to Ms. Bozeman, activities such as lifting, doing housework, bending, or raising her arms aggravated her symptoms. (Doc. 4-15, p. 2). Ms. Bozeman stated that medication, including Advil, NSAIDs, and muscle relaxers, relieved her symptoms. (Doc. 4-15,

pp. 2, 3). Ms. Bozeman reported that physical therapy made her symptoms worse. (Doc. 4-15, p. 3).

Dr. Gullung examined Ms. Bozeman's thoracic spine and observed that her gait and station were normal and that she walked independently. (Doc. 4-15, p. 4). Dr. Gullung reported that Ms. Bozeman's thoracic alignment was normal. (Doc. 4-15, p. 3). Dr. Gullung detected a decreased range of motion and normal strength in Ms. Bozeman's lower extremities. (Doc. 4-15, p. 3). Dr. Gullung found "tenderness at the midline, but no paraspinal spasm." (Doc. 4-15, p. 3). The results of Ms. Bozeman's Spurling test were negative. (Doc. 4-15, p. 4).[10]

Dr. Gullung examined Ms. Bozeman's lumbar spine and observed that her gait and station were abnormal. (Doc. 4-15, p. 4). Dr. Gullung reported that Ms. Bozeman's lumbar alignment was normal. (Doc. 4-15, p. 4). Dr. Gullung detected a limited range of motion when Ms. Bozeman flexed, extended, or rotated and "[t]enderness around the midline and paraspinal area." (Doc. 4-15, p. 4). Dr. Gullung reported normal muscle strength, tone, and reflexes. (Doc. 4-15, p. 4). The results of Ms. Bozeman's straight leg raise test were positive and Waddell's signs

---

[10] "The Spurling test helps to diagnose cervical radiculopathy. It [i]s also called the Spurling compression test or Spurling maneuver." https://www.healthline.com/health/spurling-test (last visited Feb. 13, 2020).

negative.  (Doc. 4-15, p. 4).[11]  Dr. Gullung examined Ms. Bozeman's neck and reported normal findings.  (Doc. 4-15, p. 4).

After reviewing several spine images, Dr. Gullung detected severe kyphosis in Ms. Bozeman's upper spine and degenerative disc disease and stenosis of L4/5 5/1.  (Doc. 4-15, p. 4).  Dr. Gullung's assessments included spinal stenosis and intervertebral disc disorders, displacement, degeneration, radiculopathy in the lumbar region; spinal stenosis, secondary kyphosis, and intervertebral disc degeneration in the thoracic region; and low back pain.  (Doc. 4-15, p. 4).  Dr. Gullung prescribed Skelaxin (one 800 mg tablet three times daily) and Celebrex (one 200 mg capsule daily) and ordered an MRI of Ms. Bozeman's lumbar spine.  (Doc. 4-15, p. 5).[12]

In March 2017, based on a Quality of Life referral, Ms. Bozeman visited Dr. Crawford at The Crawford Clinic.  (Doc. 4-14, pp. 80, 81).  Ms. Bozeman complained of joint pain.  (Doc. 4-14, p. 80).  Ms. Bozeman reported three years of joint pain, stiffness, and swelling.  (Doc. 4-14, p. 80).  Ms. Bozeman stated that she

---

[11] "[C]linicians have utilized Waddell signs to detect psychogenic, sometimes inappropriately labeled 'non-organic,' manifestations of low back pain in patients." https://www.ncbi.nlm.nih.gov/books/NBK519492/ (last visited Feb. 12, 2020).

[12] Skelaxin "is used to treat muscle spasms [and] pain."  https://www.webmd.com/drugs/2/drug-7897/skelaxin-oral/details (last visited Feb. 13, 2020).

Celebrex "is a nonsteroidal anti-inflammatory drug . . . . used to treat pain or inflammation caused by many conditions."  https://www.drugs.com/celebrex.html (last visited Feb. 13, 2020).

was seeing an orthopedist for back trouble and taking meloxicam and a muscle relaxer. (Doc. 4-14, p. 80). Dr. Crawford reported that Ms. Bozeman had tenderness in her cervical and lumbar processes but a "[g]ood range of motion" in the joints. (Doc. 4-14, p. 81). Dr. Crawford recommended physical/aquatic therapy and x-rays of Ms. Bozeman's "hands, wrists, feet, ankles, and knees." (Doc. 4-14, p. 81). Dr. Crawford planned to confer with Ms. Bozeman's orthopedist and instructed Ms. Bozeman to return in three weeks. (Doc. 4-14, p. 81).

Ms. Bozeman returned to Dr. Gullung in late March 2017. (Doc. 4-15, pp. 6, 8). Ms. Bozeman rated her low back and neck pain as five. (Doc. 4-15, p. 6). Ms. Bozeman stated that her neck pain began one day before her appointment. (Doc. 4-15, p. 6).

Dr. Gullung reported four out of five strength in Ms. Bozeman's quadriceps and full strength elsewhere. (Doc. 4-15, p. 7). Ms. Bozeman exhibited decreased sensation in her anterior thighs. (Doc. 4-15, p. 7). Otherwise, Dr. Gullung's lumbar, thoracic, and cervical findings were similar to those from Ms. Bozeman's February 2017 visit. (Doc. 4-15, pp. 7, 8). Based on a referral from Dr. Gullung, Ms. Bozeman had a lumbar MRI at Southeastern Imaging Group in March 2017. (Doc. 4-14, p. 82). Dr. Eichelberger's impressions were "[s]coliosis and degenerative change." (Doc. 4-14, pp. 82-83).

Dr. Gullung reported that the MRI of Ms. Bozeman's back revealed a "broad base disc L4/5." (Doc. 4-15, p. 8). Dr. Gullung's assessments included spinal stenosis and intervertebral disc disorders, displacement, degeneration, radiculopathy in the lumbar region; spinal stenosis, secondary kyphosis, and intervertebral disc degeneration in the thoracic region; and low back pain. (Doc. 4-15, p. 8). Dr. Gullung prescribed Ms. Bozeman an orthopedic brace and recommended a bilateral L4/5 steroid injection. (Doc. 4-15, p. 8). Ms. Bozeman returned Alabama Ortho Spine & Sports for the recommended steroid injection in April 2017. (Doc. 4-15, p. 9).

### 3. The ALJ's Assessment of Ms. Bozeman's Records

The ALJ discounted Ms. Bozeman's complaints of back pain. The ALJ found that Ms. Bozeman's impairments "could reasonably be expected to cause the alleged symptoms," but the ALJ determined that Ms. Bozeman's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Doc. 4-3, p. 15). The ALJ observed that Ms. Bozeman's medical records did not substantiate "disabling musculoskeletal impairments." (Doc. 6-3, p. 15). The ALJ found that Ms. Bozeman's daily activities "suggest[ed] greater than disabling restriction." (Doc. 4-3, p. 16).

4.    Analysis

The ALJ overlooked some of the medical records that relate to Ms. Bozeman's back pain. As the summary above indicates, Ms. Bozeman's medical records confirm that she experienced back pain before and during the disability period and began taking prescription medication in 2014 to manage her pain. Ms. Bozeman's providers prescribed several medications for back pain, and she received a steroid injection in 2017. (Doc. 4-15, p. 9). In May 2015, a CRNP at Quality of Life increased Ms. Bozeman's meloxicam prescription from 7.5 mg to 15 mg because of increasing pain. (Doc. 4-11, p. 40). Ms. Bozeman rated her pain nine in February 2017. (Doc. 4-15, p. 2; *see also* Doc. 4-12, p. 14 (stating nine as worse pain in February 2016)). Dr. Gullung observed that Ms. Bozeman had an abnormal lumbar gait and station and a positive straight leg raise test in February and March 2017. (Doc. 4-15, pp. 4, 7). Dr. Gullung diagnosed Ms. Bozeman with multiple musculoskeletal disorders and prescribed an orthopedic brace. (Doc. 4-15, p. 8). For the purposes of this opinion, the Court accepts that Ms. Bozeman's work history bolsters her credibility.[13] These parts of Ms. Bozeman's medical history are consistent with her pain testimony.

---

[13] Ms. Bozeman argues that the ALJ erred in applying the pain standard because he did not acknowledge her "excellent work history." (Doc. 9, p. 4). Ms. Bozeman relies on cases from the Seventh Circuit Court of Appeals and the Northern District of Florida. (Doc. 9, p. 4) (citing *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015); *Cooper v. Astrue*, No. 408-CV-00479-MP-WCS, 2009 WL 3242029, at *17 (N.D. Fla. Oct. 6, 2009)). The Commissioner responds that these authorities are non-binding, that an ALJ is not obligated to mention every piece of evidence, and

Other substantial parts of her medical history are not. During several visits with treating providers, Ms. Bozeman complained of issues other than or denied back pain (*see, e.g.*, Doc. 4-10, pp. 84, 90, 99, 113; Doc. 4-14, pp. 2, 14, 34, 44), rated her pain at level five or lower (Doc. 4-10, pp. 96 (zero in February 2014), 101 (zero in March 2014), 106 (four in mid-March 2014), 111 (zero in June 2014), 115 (zero in mid-June 2014); Doc. 4-11, pp. 15 (zero in late June 2014 and late July 2014), 19 (zero in January 2015), 28 (zero in March 2015), 37 (three in May 2015), 65 (four when resting in early July 2015); Doc. 4-14, pp. 6 (zero in late July 2015), 15 (four in August 2015), 27 (three in January 2016), 34 (zero in April 2016), 41 (four in July 2016), 50 (zero in September 2016), 58 (two in October 2016), 64 (four in late October 2016), 72 (three in January 2017); (Doc. 4-12, p. 14) (five in February 2016); Doc. 4-15, p. 6 (five in March 2017)), or reported that she managed her back pain effectively with medication, (Doc. 4-15, pp. 2, 3).[14]

---

that Ms. Bozeman does not have an excellent work history given years of no income or significant gainful activity. (Doc. 8, pp. 9-11; Doc. 4-6, pp. 6-7). On the record in this case, if the ALJ erred in omitting a discussion of Ms. Bozeman's work history, the error was harmless. *See* page 37 below.

[14] Some of Ms. Bozeman's reports of minimal back pain predate the findings of increasing spinal curvature and deformity. Ms. Bozeman reported higher pain scores as her scoliosis became more pronounced. Still, Ms. Bozeman's pain levels between 2014 and 2017 do not show a linear increase or substantiate her July 2015 statement to consultative examiner, Dr. Robertson, that four was her resting pain level. *Compare* (Doc. 4-11, p. 65), *with* (Doc. 4-14, pp. 6 (zero in late July 2015), 15 (four in August 2015), 27 (three in January 2016), 34 (zero in April 2016), 41 (four in July 2016), 50 (zero in September 2016), 58 (two in October 2016), 64 (four in late October 2016), 72 (three in January 2017)). Ms. Bozeman's pain scores do not establish 12 consecutive months of subjective disabling symptoms. *See* SSR 82-52, 1982 WL 31376, at *1 ("Severe impairments

Ms. Bozeman's reports of little or no pain and medication easing her pain undermine her testimony of disabling symptoms. *See Markuske v. Comm'r of Soc. Sec.*, 572 Fed. Appx. 762, 766 (11th Cir. 2014) (claimant's self-reporting that medication has reduced pain symptoms supports an adverse credibility finding). Ms. Bozeman received very few adjustments to her pain medication during the disability period. (Doc. 4-12, pp. 66-68). Ms. Bozeman reported walking for exercise, and treating physicians and CRNPs encouraged Ms. Bozeman to walk or participate in physical therapy. (*See, e.g.*, Doc. 4-14, p. 16; Doc. 4-12, p. 14). Dr. Gullung observed that Ms. Bozeman had an abnormal gait and station in 2017, but that occurred at the end of the disability period. (Doc. 4-15, p. 4). Thus, substantial evidence supports the ALJ's finding that the objective evidence is inconsistent with Ms. Bozeman's testimony regarding the debilitating effects of her back pain. *Markuske*, 572 Fed. Appx. at 767 ("The objective medical evidence cited by the ALJ provided 'adequate reasons' for her decision to partially discredit Markuske's subjective complaints [of back, neck, elbow, and carpal tunnel syndrome pain].").

The ALJ also relied on Ms. Bozeman's daily activities to discredit her pain testimony. (Doc. 4-3, p. 15). When examining daily activities, an ALJ must consider the entire record. *See Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir.

_____

lasting less than 12 months cannot be combined with successive, unrelated impairments to meet the duration requirement.").

1986) (Appeals Council erred in finding that claimant's "daily activities . . . have not been significantly affected" when the Appeals Council "ignored other evidence that her daily activities have been significant affected."). "[P]articipation in everyday activities of short duration" will not preclude a claimant from proving disability. *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). Instead, "[i]t is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform chores or drive short distances." *Early v. Astrue*, 481 F. Supp. 2d 1233, 1239 (N.D. Ala. 2007). Moreover, an ALJ cannot discredit a plaintiff's description of limited daily activities merely because those limitations cannot be verified objectively. *See Grier v. Colvin*, 117 F. Supp. 3d 1335, 1353 (N.D. Ala. 2015).

Here, Ms. Bozeman's testimony about shopping, visiting neighbors door-to-door, walking her dog, and driving are inconsistent with her claim that she cannot do anything because of her back pain. On this record, substantial evidence supports the ALJ's decision to partially discredit Ms. Bozeman's testimony concerning the limitations that she attributes to pain. The ALJ did not ignore Ms. Bozeman's complaints of pain; the ALJ weighed that information in arriving at Ms. Bozeman's RFC. Thus, substantial evidence supports the ALJ's treatment of Ms. Bozeman's pain testimony.

B.     Step-Four Analysis

Ms. Bozeman challenges several aspects of the ALJ's step-four analysis. Because the Court affirms the ALJ's pain evaluation, the ALJ did not commit error in formulating Ms. Bozeman's RFC, disregarding Grid Rule 201.14, finding that Ms. Bozeman could perform her past relevant work, or questioning the vocational expert.

The ALJ gave substantial weight to Dr. Robertson's opinion and adequately based Ms. Bozeman's light RFC partially on that opinion.   (Doc. 4-3, p. 16). Because the ALJ determined that Ms. Bozeman could perform past relevant work at step four, Grid Rule 201.14, which is a step five consideration, did not apply.   20 C.F.R. §§ 404.1569, 404.1520(a)(4)(iv).

Ms. Bozeman contends that remand is appropriate because the ALJ did not develop the physical requirements and demands of Ms. Bozeman's past work as a packager.   (Doc. 7, pp. 20-21).   "Where 'there is no evidence of the physical requirements and demands of the claimant's past work and no detailed description of the required duties was solicited or proffered,' the ALJ 'cannot properly determine' the nature of the claimant's past work—and therefore cannot say whether the claimant is still able to perform that work given her current limitations."   *Holder v. Soc. Sec. Admin.*, the  771 Fed. Appx. 896, 899 (11th Cir. 2019) (quoting *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987)); *Lucas v. Sullivan*, 918 F.2d 1567, 1574 n.3 (11th Cir. 1990) ("To support a conclusion that [a claimant] is able to return

to her past work, the ALJ must consider all the duties of that work and evaluate her ability to perform them in spite of her impairments.").  The Eleventh Circuit Court of Appeals concluded in *Holder* that the ALJ had developed the record on past work adequately:

> The Work History Report, the testimony of Holder and the vocational expert, and the DOT combine to paint a full picture of Holder's past relevant work—both as she performed it herself, and as it is generally performed. There was enough evidence in the record for the ALJ to compare Holder's current abilities to the physical demands of her previous employment.

*Holder*, 771 Fed. Appx. at 899.

The Commissioner maintains that the record contained sufficient evidence for the ALJ to find that Ms. Bozeman could perform the packager job.  (Doc. 8, p. 13).  The Commissioner cites Ms. Bozeman's work history reports in which she described her experience assembling plastic cutlery.  (Doc. 4-7, pp. 30-31, 44, 48).  The Court cannot tell when Ms. Bozeman completed these reports.  (Doc. 4-7, pp. 30, 51) (undated and unsigned).  One report indicates that the machine-operating position required Ms. Bozeman to walk one hour, stand seven hours, lift 40 pounds at the most, and lift ten pounds frequently.  (Doc. 4-7, p. 31).  Another report indicates that Ms. Bozeman stood eight hours, climbed 30 minutes, and lifted no more than ten pounds.  (Doc. 4-7, p. 48).  The first description is consistent with the RFC for light work, but the other is only partially consistent.  *See* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time . . . .").

The vocational expert testified that he reviewed Ms. Bozeman's work history in preparation for the hearing. (Doc. 4-3, p. 80). The vocational expert stated that packager was the appropriate DOT (Dictionary of Occupational Titles) name for Ms. Bozeman's plastic cutlery job and that the position had a medium exertional classification. (Doc. 4-3, p. 80). The vocational expert stated that based on Ms. Bozeman's description of her job in the record, "she was more likely exerting in the light range with this work." (Doc. 4-3, pp. 80-81). The Commissioner notes that Ms. Bozeman's counsel did not object to the vocational expert's testimony about how Ms. Bozeman performed the packager position. (Doc. 8, p. 13).

"A claimant is not disabled if she is able to perform her past work either as she actually performed it or as it is generally performed in the national economy." *Fries v. Comm'r of Soc. Sec. Admin.*, 196 Fed. Appx. 827, 831 (11th Cir. 2006) (citing 20 C.F.R. § 404.1560(b)). And Ms. Bozeman "bears the burden of showing that she cannot return to her past relevant work." *Fries*, 196 Fed. Appx. at 831 (citing *Lucas*). On this record, the ALJ had sufficient evidence to conclude that Ms. Bozeman could work as a packager in a light capacity which, according to the vocational expert's unchallenged testimony, was how she had performed the position in the past.

Alternatively, the Commissioner argues that if Ms. Bozeman is correct about the packager position, then the harmless error rule should apply because Ms.

Bozeman has not challenged the ALJ's finding that she could return to waitressing. (Doc. 8, p. 14, n.4); *see Mabrey v. Acting Comm'r of Soc. Sec. Admin.*, 724 Fed. Appx. 726, 727 (11th Cir. 2018) ("Irrelevant errors are harmless and do not require reversal or remand.") (citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983)). In her reply, Ms. Bozeman does not respond to the Commissioner's harmless error contention and identifies only the packager position as problematic. (Doc. 9, p. 6). Given the ALJ's unchallenged waitressing finding, a remand would not impact the outcome of Ms. Bozeman's claim. Consequently, at most, the ALJ committed harmless error in not developing the record further on the packager position.

The ALJ's questioning of the vocational expert was adequate. The ALJ was not obligated to fully credit Ms. Bozeman's subjective allegations when relying on vocational expert testimony. *See Crawford*, 363 F.3d at 1161 ("[T]he ALJ was not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported."). And the ALJ elicited testimony from the vocational expert that Ms. Bozeman could perform the packaging job "as she performed it" and "the short-order cook, both as performed nationally and as actually performed" at the light exertional level. (Doc. 4-3, p. 85). Therefore, on the administrative record in this case, the ALJ appropriately relied on the vocational expert's testimony in concluding that Ms. Bozeman was capable, as of the date of the ALJ's opinion, of working as a packager and waitress.

## V.  CONCLUSION

For the reasons discussed above, the Court affirms the Commissioner's decision.

**DONE** this 29th day of February, 2020.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE